Citation Nr: 1829834 
Decision Date: 08/27/18 Archive Date: 09/05/18

DOCKET NO. 14-20 996 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in St. Petersburg, Florida


THE ISSUES

1. Entitlement to an initial disability rating in excess of 30 percent for ischemic heart disease.

2. Entitlement to special monthly compensation (SMC) based on the need for the regular aid and attendance of another or housebound status.

3. Entitlement to specially adapted housing or home adaptation.


ATTORNEY FOR THE BOARD

Mary E. Rude, Counsel






INTRODUCTION

The Veteran served on active duty from December 1967 to September 1973; however, only the period from December 1967 to December 1969 is honorable service for VA purposes. 

These matters come before the Board of Veterans' Appeals (Board) on appeal from June and August 2011 rating decisions by the Department of Veterans Affairs (VA) Regional Office (RO) in St. Petersburg, Florida. In December 2016, these issues were remanded for further development.

The Board also notes that the Veteran submitted a Rapid Appeals Modernization Program (RAMP) opt-in election letter in February 2018. The issues listed above had already been certified to and activated at the Board, and were no longer eligible for review through the RAMP program, but the Veteran's remaining claims which are still pending have not yet been perfected to appeal and certified to the Board, will be reviewed through this program at a later date.

In April 2018, the Veteran submitted an Application for Disability Compensation requesting increased ratings for left leg and upper arm scars and a gunshot wound and to entitlement to service connection for arthritis. The issues have not yet been adjudicated by the Agency of Original Jurisdiction (AOJ), and they are referred to the AOJ for appropriate action. 38 C.F.R. § 19.9(b) (2017).

The Board also notes that in December 2016, the Board granted entitlement to service connection for bilateral lower extremity peripheral neuropathy. A rating decision effectuating this grant has not yet been issued, and the Veteran has not yet been assigned disability ratings for these disorders.

Additional evidence was obtained following the most recent supplemental statement of the case. In July 2018, the Veteran waived AOJ review of this evidence. 

The issue of entitlement to SMC based on the need for the regular aid and attendance of another or housebound status is addressed in the REMAND portion of the decision below and are REMANDED to the AOJ.

FINDINGS OF FACT

1. On September 9, 1996, the Veteran underwent coronary artery bypass graft surgery.

2. From October 13, 1993 to September 8, 1996 and from September 9, 1997 to the present, the Veteran's ischemic heart disease did not manifest with a history of acute coronary occlusion or thrombosis or substantiated repeated anginal attacks, and it did not render infeasible more than light manual labor. Since January 12, 1998, the Veteran's ischemic heart disease has not resulted in more than one episode of acute congestive heart failure in a year, a metabolic equivalents of task (METs) level of not greater than 5, or a left ventricular dysfunction with an ejection fraction of 30 to 50 percent.

3. The Veteran's service-connected disabilities do not result in loss or permanent loss of use of one or both feet; loss or permanent loss of use of one or both hands; permanent impairment of vision of both eyes; severe burn injury; ankylosis of one or both knees or one or both hips, or amyotrophic lateral sclerosis (ALS).


CONCLUSIONS OF LAW

1. From September 9, 1996 to September 8, 1997, the criteria for a 100 percent rating for ischemic heart disease have been met. 38 U.S.C. §§ 1155, 5107 (2012); 38 C.F.R. §§ 3.102, 3.159, 3.321, 4.1, 4.3, 4.7, 4.29, 4.30 (2017); 38 C.F.R. § 4.104, Diagnostic Codes 7005, 7017 (1993).

2. From October 13, 1993 to September 8, 1996 and from September 9, 1997 to the present, the criteria for an initial rating in excess of 30 percent for ischemic heart disease have not been met. 38 U.S.C. §§ 1155, 5107; 38 C.F.R. §§ 3.102, 3.159, 3.321, 4.1, 4.3, 4.7, 4.104, Diagnostic Codes 7005, 7017 (2017); 38 C.F.R. § 4.104, Diagnostic Codes 7005, 7017 (1993).

3. The criteria for establishing entitlement to specially adapted housing or special home adaptations are not met. 38 U.S.C. §§ 2101, 5103, 5103A, 5107 (2012); 38 C.F.R. §§ 3.102, 3.159, 3.350, 3.809, 3.809a (2017).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

VA has met all statutory and regulatory notice and duty to assist provisions. See 38 U.S.C. §§ 5100, 5102, 5103, 5103A, 5106, 5107, 5126 (2012); 38 C.F.R. §§ 3.102, 3.156(a), 3.159, 3.326 (2017).

Ischemic Heart Disease

The Veteran contends that his ischemic heart disease warrants an initial rating higher than 30 percent. In a June 2011 rating decision, the Veteran was granted entitlement to service connection for ischemic heart disease, effective October 13, 1993, pursuant to Nehmer v. United States Veterans Admin., 284 F.3d 1158 (9th Cir. 2002) and the rules for allowance of earlier effective dates for previously denied claims found to be associated with herbicide exposure under 38 C.F.R. § 3.816(c)(2) (2017).

Disability evaluations are determined by the application of the VA's Schedule for Rating Disabilities (Rating Schedule), 38 C.F.R. Part 4. The percentage ratings in the Rating Schedule represent, as far as can be practicably determined, the average impairment in earning capacity resulting from diseases and injuries incurred or aggravated during military service and their residual conditions in civil occupations. 38 U.S.C. § 1155; 38 C.F.R. § 4.1 (2017). In order to evaluate the level of disability and any changes in condition, it is necessary to consider the complete medical history of the Veteran's condition. Schafrath v. Derwinski, 1 Vet. App. 589 (1991). 

Separate evaluations may be assigned for separate periods of time based on the facts found. In other words, the evaluations may be staged. Fenderson v. West, 12 Vet. App. 119, 126 (1999); Francisco v. Brown, 7 Vet. App. 55, 58 (1994); Hart v. Mansfield, 21 Vet. App. 505 (2007). Where there is a question as to which of the two evaluations shall be applied, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria required for that rating. 38 C.F.R. § 4.7 (2017).

Effective January 12, 1998, the criteria for evaluating disorders of the cardiovascular system were revised.

Under the former rating criteria, Diagnostic Code 7005 allowed for a minimum 30 percent rating was assigned for arteriosclerotic heart disease following typical coronary occlusion or thrombosis or with a history of substantiated anginal attack, ordinary manual labor feasible. A 60 percent rating was assigned for arteriosclerotic heart disease following typical history of acute coronary occlusion or thrombosis or with history of substantiated repeated anginal attacks, more than light manual labor not feasible. A 100 percent rating was assigned during and for 6 months following acute illness from coronary occlusion or thrombosis with circulatory shock, etc. A 100 percent rating also was also assigned under the former Diagnostic Code 7005 after 6 months with chronic residual findings of congestive heart failure or angina on moderate exertion or more than sedentary employment precluded. 38 C.F.R. § 4.104, Diagnostic Code 7005 (1993).

Under the former rating criteria, Diagnostic Code 7017 allowed for a 100 percent rating for one year following coronary artery bypass surgery, with a minimum rating of 30 percent thereafter. 38 C.F.R. § 4.104, Diagnostic Code 7017 (1993).

The 100 percent rating assigned under Diagnostic Code 7017 was to commence after the initial grant of a 1 month total rating assigned under 38 C.F.R. § 4.30 (2017), for convalescence after hospital discharge. 38 C.F.R. § 4.30 allows for a total disability rating when it is established by report at hospital discharge that the veteran has had1) surgery necessitating at least one month of convalescence, 2) surgery with severe postoperative residuals such as incompletely healed surgical wounds, amputation stumps, a full body cast, or necessity of a wheelchair or crutches, or 3) immobilization by cast of one major joint or more. 38 C.F.R. § 4.30. Under 38 C.F.R. § 4.29 (2017), a 100 percent rating can be assigned when a veteran requires hospitalization for treatment of a service-connected disability for a period in excess of 21 days. 

After January 12, 1998, arteriosclerotic heart disease/coronary artery disease and residuals of coronary bypass surgery were rated under Diagnostic Codes 7005 and 7017. 38 C.F.R. § 4.104, Diagnostic Codes 7005, 7017 (2017). Under both diagnostic codes, a 30 percent rating is assigned when a workload greater than 5 metabolic equivalents of task but not greater than 7 metabolic equivalents of task results in dyspnea, fatigue, angina, dizziness, or syncope; or there is evidence of cardiac hypertrophy or dilatation. Id.

A 60 percent rating is assigned when there is more than one episode of acute congestive heart failure in the past year, or there is a workload of greater than 3 METs but not greater than 5 METs resulting is dyspnea, fatigue, angina, dizziness, or syncope, or there is left ventricular dysfunction with an ejection fraction of 30 to 50 percent. Id.

Under Diagnostic Code 7017, for three months following hospital admission for surgery for a coronary bypass surgery, a 100 percent rating is assigned. 38 C.F.R. § 4.104, Diagnostic Code 7017 (2017).

The Veteran's private treatment records show that throughout the 1990s, the Veteran had frequent complaints of shortness of breath and dizziness, which was often indicated to be in relationship with his heavy smoking history and diagnosis of hemoptysis and frequent bronchitis, and the Veteran received diagnoses of asthma, emphysema, and chronic obstructive pulmonary disease. In August 1993 the Veteran was diagnosed with arrhythmias. He complained of dizzy spells, shortness of breath, palpitations, and pain and numbness in the left side. He underwent an ECG in July 1994 due to heart palpitations, and in September 1994 reported chest pain. A July 1994 ultrasound found 45 percent stenosis in the bilateral internal carotid with scattered plaque.

At an October 1994 Agent Orange examination, the Veteran reported having chest pain, dizziness, and shortness of breath. He reported that he was evaluated at a private hospital and was given a treadmill test, but he could not perform it. He reported being told he had previously had transient ischemic attacks. The Veteran was diagnosed with coronary artery disease, history of transient ischemic attacks, and COPD. In November 1994, he reported that he had a heart catheterization done.

In January 1995, he was hospitalized for 5 days due to chest pain and shortness of breath. Myocardial infarction was ruled out, and the Veteran was found to be stable. An EEG with EKG recording showed normal sinus rhythm with intermittent sharp waves over the left central/temporal region suggestive of an underlying epileptic focus. 

A January 1995 ECHO report found left ventricle ejection fraction of 31 (25-45 percent). There was normal chamber size and normal mitral flow pattern. A February 1995 exercise treadmill test report, which did not include complete results, findings, or interpretation, listed the METs result as 4, but with no other data showing how that finding was reached, indicating that this test was not completed. Later notations by the Veteran's treating medical professionals confirm that the stress test was given but was not completed.

At a July 1995 VA examination, the Veteran reported having left-sided chest pain off and on for the past 9-10 months. He reported that he had been given a treadmill test but was not able to finish it, and he reported having a heart attack in November 1994. He was found to have overall normal function, normal mitral flow pattern, and normal left ventricle function. The examiner noted that the Veteran's October 1994 chest X-ray had been within normal limits. Physical examination found no heart murmur or gallop. He was diagnosed with coronary artery disease.

In February 1995, the Veteran was recommended for psychiatric evaluation due to suspected psychosomatic complaints. He was found to have psychosomatic symptoms given the "bizarre nature and shear multitude" of symptoms despite a normal physical examination. In February 1996, the Veteran reported symptoms of paralysis which were found to likely be either a transient ischemic attack or a seizure. He reported that he had passed out and woke up on the floor and was experiencing atypical chest pain. In June 1996, the Veteran reported that he had had a transient ischemic attack in January 1995.

In September 1996, the Veteran was admitted to rule out myocardial infarction due to chest pain. Myocardial infarction was ruled out, and an exercise stress test was negative, and he was noted to have had a medical history of myocardial infarction in November 1994 and left-sided cardiovascular accident in 1995. The Veteran was found to have a lesion in his lung and a long history of smoking.

The Veteran reported further chest pain in September 1996, and on September 9, 1996, he underwent a right thoracotomy and lower lobe wedge resection of the lung. He also underwent coronary artery bypass grafting times 4. He was discharged on September 17, 1996. He was discharged in satisfactory condition, but developed shortness of breath and left shoulder pain, and returned on September 23 to have a drain placed in the upper back the next day. He was discharged on October 2, 1996. The final summary noted that an exercise stress test in the past had been negative.

A November 1997 chest X-ray showed no acute disease. An August 1997 MRI showed small changes consistent with ischemic demyelinization, suggesting atherosclerotic disease of the internal carotid arteries. An August 1999 chest X-ray showed no acute cardiopulmonary abnormalities.

An April 2003 ECHO test found mild biatrial enlargement with normal ventricular chamber sizes.

In February 2008, the Veteran had extreme shortness of breath and was diagnosed with unstable angina, but he declined admittance to the hospital. Later that month, the Veteran underwent left heart catheterization, left ventricle angiography, and coronary angiography. His ejection fraction was 60 percent with normal wall motion, and he was found to have nonobstructive coronary artery disease with normal left ventricle function and hemodynamics.

At a September 2010 VA examination, the Veteran reported experiencing frequent chest pain and taking nitroglycerin tabs. He had dyspnea on mild exertion. Physical examination found no evidence of congestive heart failure, there were no extra heart sounds, and rhythm was regular. A cardiac stress test was not indicated because the examiner found that the METs was easily estimated and was greater than 10. Left ventricular testing found ejection fraction of greater than 50 percent. The examiner diagnosed the Veteran with ischemic heart disease, but found that it would have no effect on his occupation or daily activities.

In September 2012 the Veteran underwent a left heart catheterization, left ventricle angiography, coronary angiography, femoral angiography, and stenosis. He was found to have an ejection fraction of 60 percent, with normal wall motion. The Veteran left the hospital the same day as the procedure, against medical advice, and refused to come back in to have his post-surgery dual antiplatelet therapy.

At an April 2013 evaluation for chest pain, the examiner discussed the Veteran's March stress perfusion examination, which found mild mid anteroseptal diminished activity and a left ventricle ejection fraction of 64 percent. She found that the Veteran's symptoms were likely not cardiac in nature.

In March 2016, a myocardial perfusion scan found normal left ventricular wall motion and ejection fraction of 58 percent. 

At a March 2017 VA examination, the Veteran reported that he easily got out of breath. The examiner noted that the Veteran's history of having two past myocardial infarctions was not substantiated within the medical treatment records and that multiple imaging studies documented the absence of evidence of a prior myocardial infarction. The examiner found that the Veteran had undergone a successful surgery in September 2012, but that he did not have congestive heart failure, cardiac arrhythmia, or a valve condition. She found that exercise stress testing was not required, and that the Veteran's descriptions and the treatment records indicated that the presence of non-cardiac conditions would impede the utilization of treadmill testing to identify the presence of ischemia and its resulting METs limitations. She found that the Veteran's heart condition did not impact his ability to work and that his estimated METs level was greater than 7-10. She based this finding upon the normal left ventricular ejection fraction and wall motion following successful stent placement surgery. She wrote that the Veteran's activity tolerance would be due to other health conditions. She discussed the Veteran's past medical history and complaints of chest pain, but found that it was highly unlikely that the Veteran's exertional chest pain and breathing symptoms were etiologically related to his service-connected heart condition.

The Board allows that under 38 C.F.R. § 4.104, Diagnostic Code 7017 (1993), a 100 percent rating can be assigned for the Veteran's coronary artery bypass surgery for the one year period following that surgery, September 9, 1996 to September 8, 1997. The Board does not find, however, that any additional time can be added for the total evaluation due to hospitalization or convalescence under 38 C.F.R. § 4.29 and 38 C.F.R. § 4.30. The Veteran was not hospitalized for a period in excess of 21 days, and there is no medical evidence indicating that the Veteran required at least one month of convalescence following the surgery. While the Veteran did require a second hospitalization for treatment of fluid buildup near his lungs, this addition hospitalization still did not result in more than 21 days of hospitalization, nor does the evidence show that the Veteran had severe post-operative residuals as would allow for a convalescence rating under 38 C.F.R. § 4.30. The Board therefore finds that September 9, 1996 to September 8, 1997 is the appropriate period for the assignment of a 100 percent total rating. See 38 C.F.R. § 4.104, Diagnostic Code 7017 (1993).

For the stages of October 13, 1993 to September 8, 1996 and September 9, 1997 to the present, the Board does not find that a rating higher than 30 percent can be assigned. 

From October 13, 1993 to September 8, 1996, only the regulations in effect prior to January 12, 1998 can be applied. When the governing law or regulations change during an appeal, the most favorable version will be applied. See Karnas v. Derwinski, 1 Vet. App. 308, 312-313 (1991). Retroactive application of statutes and regulations, however, cannot be construed to have retroactive effect unless their language requires this result. See Kuzma v. Principi, 341 F.3d 1327, 1328-1329 (2003). There is no such language in new regulations pertaining to evaluation of heart disorders.

For a higher rating of 60 percent, the Veteran must demonstrate a history of acute coronary occlusion or thrombosis or with history of substantiated repeated anginal attacks, and show that more than light manual labor is not feasible. The Board does not find that the medical evidence of record indicates such a finding. At no time from October 13, 1993 to September 8, 1996 was the Veteran found to have acute coronary occlusion or thrombosis. While he did report having attacks of chest pain, the Board notes that this was often in connection with pulmonary problems or psychiatric symptoms. In January 1995 and September 1996, myocardial infarction was ruled out after the Veteran reported chest pain, and at the July 1995 VA examination, the Veteran's heart had normal function, normal mitral flow pattern, and normal left ventricle function. The Board finds that the Veteran's symptoms do not more nearly approximate a showing of "substantiated repeated angina attacks," as many of the Veteran's complaints of chest pain or shortness of breath were not, in fact, substantiated as being caused by ischemic heart disease. The evidence also does not indicate that the Veteran was not capable of more than light manual labor. While the February 1995 stress test listed a METs finding of 4, this finding is not probative, as the test was not completed. There is no other evidence of record indicating that the Veteran's ischemic heart disease prevented him from performing more than light labor. Subsequent VA evaluations found that the Veteran had METs levels of greater than 10, and the March 2017 VA examiner noted that the Veteran's chest symptoms were likely not related to his service-connected heart condition.

The Board also acknowledges that while the Veteran was found to have a left ventricle ejection fraction of 31 in January 1995, ejection fraction test results are utilized only in the 1998 revised regulations, and not in the regulations in effect in 1995. See 38 C.F.R. § 4.104, Diagnostic Code 7017 (2017). This test finding, which occurred prior to the 1998 revision, therefore cannot be the basis for an increased rating under regulations which were not yet in effect. The Board concludes that the 30 percent evaluation assigned is appropriate for the period from October 13, 1993 to September 8, 1996.

Since September 9, 1997, the evidence also does not indicate that a rating higher than 30 percent is warranted. Under the prior regulations, there is still no evidence indicating that the Veteran had acute coronary occlusion or thrombosis or with history of substantiated repeated anginal attacks or that more than light manual labor was not feasible. While an August 1997 MRI showed ischemic demyelinization, November 1997 and August 1999 chest X-rays showed no abnormalities. While the Veteran has undergone heart catheterization, has was not diagnosed with acute coronary occlusion or thrombosis, and he has not had substantiated repeated angina attacks. Most significantly, there is no evidence indicating that the Veteran was incapable of more than light labor due to ischemic heart disease at any time since September 1997. At the September 2010 VA examination, the Veteran had an estimated METs of greater than 10 and stated that the condition had no effect on his occupation or daily activities. No other medical professional has indicated that the Veteran's ischemic heart disease prevents him from performing physical activity.

Since January 12, 1998, the revised regulations which evaluated heart disorders can be applied. The Board does not find, however, that these regulations allow for any higher rating than 30 percent. At no time since January 12, 1998 has the Veteran been found to have more than one episode of acute congestive heart failure in a year or a workload of greater than 3 METs but not greater than 5 METs resulting in dyspnea, fatigue, angina, dizziness or syncope, or; left ventricular dysfunction with an ejection fraction of 30 to 50 percent. In February 2008, the Veteran's ejection fraction was 60 percent with normal wall motion. At the September 2010 VA examination, he was found to have a METs of greater than 10, and left ventricular ejection fraction was greater than 50 percent. From 2012 to 2016, ejection fraction test results were between 58 and 64 percent. The March 2017 VA examiner also found that the Veteran had an estimated METs of greater than 7-10, and a normal ejection fraction, and stated that the Veteran's symptoms were not related to his service-connected heart condition. There is no other medical evidence of record which indicates that at any time since January 12, 1998, the Veteran had more than one episode of acute congestive heart failure in a year, a workload of not greater than 5 METs, or a left ventricular dysfunction with an ejection fraction of 30 to 50 percent.

The Board acknowledges that the Veteran's written statements and verbal reports to medical professionals indicating that he believes he has had multiple heart attacks in the past, but this is not supported by the evidence of record. The Veteran's medical records show that while the Veteran has been treated at emergency departments for chest pain and shortness of breath on several occasions, the Veteran has not actually been diagnosed with having had a heart attack at any time. At the March 2017 VA examination, the examiner noted that the Veteran's reported history of having two past myocardial infarctions, but found that it was not substantiated within the medical treatment records and that multiple imaging studies documented the absence of evidence of a prior myocardial infarction.

In sum, the Board finds that due to the Veteran's coronary artery bypass graft which occurred on September 9, 1996, the assignment of a 100 percent rating may be granted from September 9, 1996 to September 8, 1997. For the periods from October 13, 1993 to September 8, 1996 and September 9, 1997 to the present, the preponderance of the evidence is against finding that a rating higher than 30 percent is warranted. In reaching the above conclusion, the Board has considered the applicability of the benefit of the doubt doctrine. However, as the preponderance of the evidence is against the Veteran's claim, that doctrine is not applicable. 38 U.S.C. § 5107(b); Gilbert v. Derwinski, 1 Vet. App. 49, 55 (1990).

Lastly, the question of entitlement to referral for consideration of an extraschedular rating for ischemic heart disease is neither an issue argued by the claimant nor reasonably raised by the record through evidence of the collective impact of the claimant's service-connected disabilities. Yancy v. McDonald, 27 Vet. App. 484, 494 (2016). 



Specially Adapted Housing or Home Adaptation

The Veteran has requested a specially adapted housing or home adaptation grant. He has written that he needs handles in his bathroom and repairs on his porch.

Under 38 C.F.R. § 3.809, eligibility for assistance in acquiring specially adapted housing under 38 U.S.C. § 2101(a) or 2101A(a) may be granted if a veteran is entitled to compensation for permanent and total disability due to: (1) the loss, or loss of use, of both lower extremities such as to preclude locomotion without the aid of braces, crutches, canes, or a wheelchair; or (2) blindness in both eyes, having only light perception, plus the anatomical loss or loss of use of one lower extremity; or, (3) the loss or loss of use of one lower extremity together with residuals of organic disease or injury that so affect the functions of balance or propulsion as to preclude locomotion without the aid of braces, crutches, canes, or a wheelchair; (4) the loss or loss of use of one lower extremity together with the loss or loss of use of one upper extremity which so affect the functions of balance or propulsion as to preclude locomotion without the aid of braces, crutches, canes, or a wheelchair; (5) the loss or loss of use of both upper extremities; or (6) full thickness of subdermal burns that have resulted in contractures with limitation of motion of two or more extremities. 38 C.F.R. § 3.809(b). Specially adapted housing may also be granted to veterans rated as 100 percent disabling due to ALS. 38 C.F.R. § 3.809(d).

A certificate of eligibility for assistance in acquiring a special home adaptation grant may be issued to a veteran who is not entitled to a certificate of eligibility for assistance in acquiring specially adapted housing under 38 C.F.R. § 3.809, if he/she has not previously received assistance in acquiring specially adaptive housing under 38 U.S.C. § 2101(a); and is entitled to compensation for permanent and total disability which (1) is due to blindness in both eyes with 5/200 visual acuity or less, or (2) includes the anatomical loss or loss of use of both hands. 38 C.F.R. § 3.809a. The disability may also be due to deep partial thickness burns that have resulted in contractures with limitation of motion of two or more extremities or of at least one extremity and the trunk, full thickness of subdermal burns that have resulted in contractures with limitation of motion of one or more of the extremities or the trunk, or residuals of an inhalation injury. Id. 

The term "preclude locomotion" means the necessity for regular and constant use of a wheelchair, braces, crutches or canes as a normal mode of locomotion although occasional locomotion by other methods may be possible. 38 C.F.R. § 3.809(c).

The term "loss of use" of a hand or foot is defined at 38 C.F.R. § 3.350(a)(2) as that condition where no effective function remains other than that which would be equally well served by an amputation stump at the site of election below the elbow or knee with the use of a suitable prosthetic appliance. See also 38 C.F.R. § 4.63 (2017). The determination will be made on the basis of the actual remaining function, whether through acts such as grasping and manipulation for the hand, or balance and propulsion for the foot, and whether these acts could be accomplished equally well by an amputation stump with prosthesis. Id.

In Tucker v. West, 11 Vet. App. 369, 373 (1999), the United States Court of Appeals for Veterans Claims (Court) stated that the relevant inquiry concerning loss of use is not whether amputation is warranted, but whether the claimant has had effective function remaining other than that which would be equally well served by an amputation with use of a suitable prosthetic appliance. The Court also stated that in accordance with 38 C.F.R. § 4.40 (2017), the Board is required to consider the impact of pain in making its decision and to articulate how pain on use was factored into its decision.

The provisions of 38 C.F.R. §§ 3.350(a)(2) and 4.63 only provide examples and not an exclusive list of manifestations of loss of use of a foot or hand. It is not expected, especially with the more fully described grades of disabilities, that all cases will show all the findings specified; findings sufficiently characteristic to identify the disease or disability are sufficient; and above all, a coordination of rating with impairment of function will be expected in all cases. See 38 C.F.R. § 4.21 (2014) (application of rating schedule); see also Mauerhan v. Principi, 16 Vet. App. 436 (2002) (the specified factors for each incremental rating were examples rather than requirements for a particular rating; analysis should not be limited solely to whether the claimant exhibited the symptoms listed in the rating scheme).

In this case, the Board does not find that the Veteran meets any of the criteria which would allow for a finding that he is eligible for a specially adapted housing or a home adaptation grant. 

The Veteran is service-connected for PTSD, ischemic heart disease, gunshot wound to the left upper extremity, diabetes mellitus, various scars, tinnitus, and right ear hearing loss. Additionally, in a December 2016 Board decision, the Board granted entitlement to service connection for bilateral lower extremity peripheral neuropathy.

His treatment records note that he already has a VA ramp installed at his home and that he ambulates with a cane or a rollator. The Veteran has also been provided with a scooter to assist with mobility.

The Veteran is not service-connected for any eye disorder, nor has he experienced any severe burns. He has never been diagnosed with ALS, and is not service-connected for ALS.

The Veteran is service-connected for a gunshot wound to the left upper extremity, and his VA treatment records show that he has been treated for left shoulder pain. There is absolutely no indication, however, that the Veteran has had loss of use of his left arm/hand, nor has the Veteran alleged that he has had loss of use of the left upper extremity. At a March 2017 VA examination, the Veteran was found to have some loss of muscle substance, visible or measurable atrophy, and scars. He had occasional loss of power, weakness, and fatigue in the left arm. Muscle strength was diminished to 4/5. Functioning was not so diminished that amputation with prosthesis would equally serve the Veteran. The Board therefore finds that although the Veteran has decreased function in the left arm, he does not have "loss of use" of the left arm. See Tucker, 11 Vet. App. at 373.

The Board also does not find that the Veteran has "loss of use" of the lower extremities. While the Veteran's VA treatment records show that he has complained of pain, numbness, and a burning sensation in his lower extremities, the evidence does not indicate that he has had a "loss of use" of either leg or foot such that function is diminished to a level that would be equally well served by an amputation with use of a suitable prosthetic appliance.

A September 2010 VA examination found that the Veteran's lower extremities had normal reflexes and strength, with some decreased sensation.

A March 2013 home transitional care consultation found that the Veteran had decreased strength in his legs, his left foot dragged slightly, and he reported frequent falls. It was noted that the Veteran needed a grab bars, non-skid strips, a rollator, and a larger power mobility scooter. A consultation was placed for a rollator and power mobility scooter, and grab bars and nonskid strips were ordered. Also in March 2013, the Veteran was noted to have full range of motion and full weight-bearing without assistance or assistive devices.

At a January 2015 VA examination, the Veteran was found to have lower extremity peripheral neuropathy which caused severe constant pain, severe paresthesias and/or dysesthesias, and severe numbness. The neurological examination found full strength, normal reflexes, normal sense in the knees, thighs, ankles, and lower legs, and decreased senses in the feet and toes. The examiner found that the Veteran had mild incomplete paralysis of the sciatic nerve on the left and right. The Veteran reported that the symptoms in his bilateral feet limited his ability to complete chores and activities around his home.

At a March 2017 examination for peripheral neuropathy, the Veteran was found to have moderate paresthesias and/or dysesthesias and numbness in the bilateral lower extremities. He had normal ankle strength, decreased reflexes, and decreased sensation in the foot and toes. He was found to have mild incomplete paralysis in the right and left sciatic nerves. The examiner stated that the Veteran walked slowly with the assistance of a cane, and the Veteran reported using a walker to get around the house, but that stairs and slippery flooring were difficult for him.

In March 2018, the Veteran's gait was described as "unsteady" and "frail," but he was able to ambulate independently with a cane.

While the evidence shows that the Veteran has limitation of motion and difficulty ambulating, his disability is not of such a severity that it can be considered "loss of use" of one or both feet. See 38 C.F.R. § 4.63. He has never been found to have ankylosis of the knee or shortening of a lower extremity, nor has he been found to have complete paralysis of the external popliteal nerve. See 38 C.F.R. § 4.63(a), (b). The Veteran is still able to ambulate independently and to perform basic tasks of daily living. While he usually uses a cane to ambulate, this does not indicate that all locomotion is precluded without the use of the cane. The March 2015 and March 2017 VA examiner both evaluated the Veteran's peripheral neuropathy and found him to have only mild incomplete paralysis. There is no other medical evidence of record indicating that the Veteran's lower extremity peripheral neuropathy is more severe than was shown on examination, and no competent medical opinion has been given which contradicts the findings of the VA examiners or that states that the Veteran's effective function remaining is no greater than that which would be equally well provided by an amputation with use of a suitable prosthetic appliance. The Board has also taken the Veteran's reports of pain into consideration, but there is no indication that the Veteran's is precluded from locomotion due to pain in his lower extremities.

The Board acknowledges that Veteran's contentions that parts of his house require repair and that he is in need of additional grab bars in his bathroom to make it a safer environment. These assertions are likely true, but unfortunately the Veteran does not qualify for a specially adapted housing or home adaptation grant under 38 C.F.R. §§ 3.809 or 3.809a, and grants for these home repairs cannot be made under these VA regulatory provisions. The Board notes that the Veteran has already been working with a VA occupational therapist and social worker, through his VA care facility, has been provided with grab bars, nonskid strips, and a ramp for his home. The Board recommends that the Veteran continue to work with his occupational therapist to obtain the additional equipment he needs to make his home safe and suggests that he apply for a grant from the Home Improvements and Structural Alterations (HISA) program, which provides for improvements and alterations to allow entrance to the home, use of bathroom and kitchen, and improvement to paths and driveways through construction of ramping.

In sum, the weight of the competent and probative medical evidence preponderates against finding that the Veteran's service-connected disabilities result in the loss or loss of use of one or both feet or of a hand or arm. There is no indication that he would be eligible for specially adapted housing or home adaptation based on any other criteria pursuant to 38 C.F.R. §§ 3.809 or 3.809a. The Board has again afforded the Veteran the benefit of the doubt, but as the preponderance of the evidence is against the claim, it must be denied. See 38 U.S.C. § 5107(b); Gilbert, 1 Vet. App. 49 (1990).


ORDER

Entitlement to a disability rating in excess of 30 percent for ischemic heart disease from October 13, 1993 to September 8, 1996 is denied.

Entitlement to a disability rating of 100 percent for ischemic heart disease and coronary bypass surgery from September 9, 1996 to September 8, 1997 is granted, subject to the laws and regulations governing the award of monetary benefits.

Entitlement to a disability rating in excess of 30 percent for ischemic heart disease from September 9, 1997 to the present is denied.

Entitlement to specially adapted housing or home adaptation is denied.
 
 
REMAND

The Veteran also requests entitlement to SMC based on the need for the regular aid and attendance of another or housebound status. 38 U.S.C. § 1114(l), (s) (2012); 38 C.F.R. § 3.350 (2017). The Veteran has submitted many written statements describing how it is painful for him to walk, that he requires the use of a cane and a wheelchair to get around, and that he sometimes falls. He has written that he is in constant pain, feels burning in his legs, has shortness of breath, and needs to lie down for much of the day. He has written that he needs help with chores at home and grocery shopping.

The Veteran is currently service-connected for posttraumatic stress disorder (PTSD) (50 percent), ischemic heart disease (30 percent), gunshot wound to the left upper extremity (20 percent), diabetes mellitus (20 percent), left upper arm scar (10 percent), tinnitus (10 percent), head scars (0 percent), left leg scar (0 percent), right ear hearing loss (0 percent), and bilateral lower extremity peripheral neuropathy (not yet rated).

In May 2010, the Veteran submitted a self-completed VA Form 21-2680, stating that his pulmonary disease, peripheral neuropathy, and heart disease affected his abilities to function, and that he was somewhat able to prepare his own meals, but was able to feed himself and did not need assistance with bathing, tending to hygiene needs, or managing financial affairs. He marked that he did require medication management, was unable to walk more than 5 feet without the use of a cane or wheelchair, had extreme pain when trying to bend down and pick something up, and was unable to travel more than 10 miles from home. He wrote that his memory was impaired and that he could not remember simple things and was unable to leave his home without the help of his neighbors.

A March 2013 home transitional care consultation discussed the Veteran's prior fall in the bath tub. It was noted that the Veteran lived alone, although his nephew came over to help him with some things. The Veteran was found to be independent in his activities of daily living with equipment and extra time. He reported having a lot of difficulty with household chores.

The Veteran attended a VA Aid and Attendance of Housebound examination in March 2017. The examiner found that the Veteran could perform all self-care functions and could travel beyond his domicile. He was able to walk up to a few hundred yards, walking slowly and with a cane and knee braces. The examiner found that the Veteran's disabilities did not render him so helpless as to require the regular aid and attendance of another person.

In April 2018, the Veteran submitted an Application for Disability Compensation requesting increased ratings for a left leg and upper arm scars and a gunshot wound and entitlement to service connection for arthritis. The record indicates that in April 2018, a request was made for the Veteran to be afforded new VA examinations to assess the current severity of his hearing loss and tinnitus, scars, and muscle injuries due to a gunshot wound. Because these examination results will be directly relevant to the question of whether the Veteran has a need for aid and attendance or is housebound, the issue of entitlement to SMC must be deferred until these examinations can be completed. The Board requests that the AOJ reconsider the Veteran's claim only after all development has been completed with regard to the claims submitted in April 2018.
 
Accordingly, the case is REMANDED for the following action:
 
1. Obtain any outstanding, pertinent VA treatment records. 

2. After the Veteran's claims for increased ratings for left leg and upper arm scars and gunshot wound residuals and for service connection for arthritis and have been adjudicated, and a rating decision has been issued which grants entitlement to service connection for peripheral neuropathy; then, readjudicate the issue of entitlement to SMC based on the need for the regular aid and attendance of another or housebound status. If the benefit sought remains denied, provide the Veteran and his representative with a supplemental statement of the case and allow an appropriate opportunity to respond.
 
The appellant has the right to submit additional evidence and argument on the matter the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).
 



This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C. §§ 5109B, 7112 (2012).




____________________________________________
Evan M. Deichert
Acting Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs